
COURT OF APPEALS DI 1
STATE OF WASHINGTON

2013 SEP 23  AM 9: 54

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68604-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD ALLEN BRANDICH, JR. | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 23, 2013 |
| | ) | |

VERELLEN, J. — Richard Brandich appeals his conviction for attempted robbery in the first degree and attempted escape in the second degree. He contends the prosecutor impugned defense counsel when she solicited testimony from the defense expert witness that defense counsel had retained him in prior cases, suggesting defense counsel colluded with the expert. The State's cross-examination of the defense expert witness did not constitute misconduct because it was designed to examine the defense expert's bias. Even if the cross-examination did suggest defense counsel somehow benefited from retaining the expert consistently, the court gave a curative instruction directing the jury to disregard the testimony regarding any association between defense counsel and the expert. We affirm Brandich's convictions.

### FACTS

Brandich became addicted to opiates after he was laid off from his job as a general manager at Qwest. After using prescription opiates for some time, Brandich

began to use heroin because it was cheaper. On April 14, 2011, he checked himself into the Recovery Center of King County. After he was admitted, staff administered a variety of sedatives. He was discharged shortly thereafter for refusal to cooperate.

Later in the afternoon of April 14, Brandich went to a Walgreen's pharmacy in Seattle. He approached the pharmacy counter and told the pharmacy technician he was looking for "oxys."[1] The technician explained that Oxycontin was kept in a locked case. Brandich again repeated his request, flashing what appeared to be a gun. The pharmacist noticed the interaction between the technician and Brandich and came over toward them. Brandich demanded "oxys" from the pharmacist and again flashed a gun. The pharmacist yelled, "He has a gun, he's trying to rob us."[2] Brandich then quickly left.

When law enforcement contacted Brandich shortly after he left Walgreen's, he did not immediately respond to the officers' instructions and passively resisted arrest. When officers brought Brandich to police headquarters for questioning, Brandich was left alone in an interview room for approximately 20 minutes. During that time, he removed three of the four screws that held the ceiling vent in place and pulled the vent and vent housing out of place. Brandich told police he was trying to remove the vent so he could climb through the ceiling and escape from another room.

The State charged Brandich with one count of attempted robbery in the first degree and one count of attempted escape in the second degree. Brandich's defense

---

[1] Report of Proceedings (RP) (Feb. 2, 2012) at 30.

[2] RP (Feb. 2, 2012) at 53. The gun was a replica of a pistol but was actually a BB gun.

2

theory was that he could not remember anything that happened on April 14 after he was admitted to the Recovery Center.

To support Brandich's defense, defense counsel retained Dr. Robert Julien, a retired esthesiologist who also has a Ph.D. in pharmacology.[3] Dr. Julien testified that Brandich could have been experiencing a blackout during the events of April 14, caused by the drugs Brandich reported ingesting before checking himself in to the Recovery Center, in conjunction with the drugs the Recovery Center staff administered to Brandich. Because Brandich was in a state of blackout, Dr. Julien testified, Brandich could not form the requisite intent to commit the crimes, even though he appeared to be acting normally.

During the State's cross-examination of Dr. Julien, the prosecutor established Dr. Julien had testified more than 50 times for defendants, but never for the prosecution. The prosecutor also established Dr. Julien had suggested in an article published in *The National Psychologist* that forensic testimony could be lucrative for pharmacologists. The article attributed the following quote to Dr. Julien, stating that he said entering the field "can be as simple as calling the local public defender's office and saying, 'If you need help in a case involving drugs, give me a call.'"[4] When the prosecutor examined Dr. Julien further on this alleged statement, defense counsel objected because the court

---

[3] Esthesiology is the science concerned with sensory phenomena.
[4] RP (Feb. 7, 2012) at 44.

3

had already ruled in limine that Dr. Julien would not testify that his hourly rate was set by the Office of Public Defense.[5] The court overruled the objection.

The prosecutor also elicited testimony from Dr. Julien about other cases in which he testified that defendants had claimed blackout as a defense:

> Q.    And you've had at least three cases in the past year where defendants who have been caught on tape committing robberies, like of a bank or a pharmacy, have claimed amnesia?
>
> A.    Yes, ma'am. I remember two. I don't know if there were three or not.
>
> Q.    And Mr. Wolfe [Brandich's counsel] was defense counsel in all those cases?
>
> A.    In at least one other, maybe two others. I can't—I don't keep those records.
>
> Q.    And in all of those cases, you testified that drugs and/or alcohol, either together or not together, put those three men—[6]

At that point, defense counsel objected, stating he had a motion to make outside the presence of the jury. The prosecutor replied that the line of questioning went directly to Dr. Julien's bias. The court reserved ruling, and allowed the prosecution to continue cross-examination.

The prosecutor then asked Dr. Julien:

> Q.    Did Mr. Wolfe take your seminar, "Understanding Drugs of Abuse and Legal Defense"?
>
> MR. WOLFE: Objection, calls for speculation.

---

[5] The court prevented testimony on his hourly rate because it was inappropriate for the jury to know that Brandich was indigent. However, defense counsel elicited testimony from Dr. Julien on direct that Brandich was homeless.

[6] RP (Feb. 7, 2012) at 90.

4

COURT:      Sustained. Not relevant.

MR. WOLFE:   Move to strike.

COURT       There's no answer to strike. The objection is sustained.[7]

After cross-examination of Dr. Julien, outside the presence of the jury, defense counsel moved for a mistrial. Defense counsel argued the prosecutor's cross-examination regarding Dr. Julien's similar testimony in other cases with defense counsel suggested collusion between the expert and defense counsel. In essence, defense counsel suggested the jury heard testimony that he attended Dr. Julien's conference, gave him referrals, and fed him money. The prosecutor responded that she did not intend to disparage defense counsel, but rather intended to establish that Dr. Julien pandered to defense attorneys.

The court denied the motion for mistrial, but concluded it would give a curative instruction to address counsel's objection to the testimony regarding defense counsel's past work with Dr. Julien.[8] The court then instructed the jury:

> During the cross-examination this morning, there were several references made to alleged relationship or cooperation between the defense counsel and the witness. I'm going to now sustain the objections to that. I'm going to strike all of that question and testimony, and you are instructed to disregard any allegations or inferences of any kind of relationship between defense counsel and the witness.[9]

---

[7] RP (Feb. 7, 2012) at 91.

[8] The court noted the situation was "very close" and understood that public defenders often struggle to find experts to testify, and that universe of witnesses is very small. RP (Feb. 7, 2012) at 121.

[9] RP (Feb. 7, 2012) at 124.

The jury convicted Brandich as charged. The court imposed a standard range sentence on the attempted robbery conviction and a suspended sentence on the attempted escape conviction. Brandich now appeals.

ANALYSIS

*Prosecutorial Misconduct*

Brandich contends he was deprived of a fair trial due to improper cross-examination of the defense's expert witness, in which the prosecutor impugned defense counsel by suggesting defense counsel was in collusion with the expert. A prosecutor may not disparage defense counsel or otherwise impugn defense counsel's integrity.[10] Such misconduct undermines the defendant's Sixth Amendment right to counsel and the right to a defense.[11] To prevail on a claim of prosecutorial misconduct, Brandich must show the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial.[12] We will find prejudice only if there is a substantial likelihood that the misconduct affected the jury's verdict.[13]

Cross-examination may include an inquiry into matters that show "bias, ill will, interest, or corruption."[14] The scope of such cross-examination is within the discretion

---

[10] State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011).

[11] Bates v. Bell, 402 F.3d 635, 647 (6th Cir. 2005); State v. Reed, 102 Wn.2d 140, 146-47, 684 P.2d 699 (1984); State v. Negrete, 72 Wn. App. 62, 67, 863 P.2d 137 (1993).

[12] State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997).

[13] Id.

[14] State v. Russell, 125 Wn.2d 24, 92, 882 P.2d 747 (1994).

of the trial court.[15] The State may question a defense witness to determine whether he is part of the "defense team."[16] The State established on cross-examination that Dr. Julien always testified for the defense, that he has testified more than 50 times, and that he has consulted with defense counsel on many more cases. The State's specific questioning of Dr. Julien about how many times he had worked with this particular defense counsel appears unnecessary, given the testimony it had already elicited about Dr. Julien's record of testifying for the defense.

However, the questioning about Dr. Julien's past work with defense counsel did not constitute misconduct. Rather, it was part of the State's larger strategy to examine whether Dr. Julien was biased and specifically marketed himself to the defense bar. While Brandich argues the jury could have inferred collusion between defense counsel and Dr. Julien, the State argues the jury could have also inferred that Wolfe found Julien's testimony helpful and hired him a few times. Further, none of the testimony suggested defense counsel personally benefited from working with Dr. Julien.

Finally, even if the State's cross-examination of Julien about his past work with defense counsel constituted misconduct, the court gave a limiting instruction. The trial court's curative instruction reflected its decision to strike all of the testimony about the alleged relationship between defense counsel and Dr. Julien, and specifically instructed the jury to "disregard any allegations or inferences of any kind of relationship between defense counsel and the witness."[17] The jury is presumed to follow instructions.[18]

---

[15] Id.

[16] Id.

[17] RP (Feb. 7, 2012) at 124.

Brandich argues the court's curative instruction underscored the impermissible inference of collusion between defense counsel and Dr. Julien. He contends the court should have affirmatively instructed the jury that no inappropriate relationship existed rather than instructing the jury that it should disregard the testimony. We find Brandich's argument unpersuasive, as the instruction mitigated the possibility the jury would draw an adverse inference from this testimony.

We conclude that no misconduct occurred because the State's cross-examination fell within the scope of its legitimate strategy to attack Dr. Julien's credibility by showing bias.

*Motion for Mistrial*

In addition to Brandich's objection based on prosecutorial misconduct, Brandich also moved for a mistrial. He argues that mistrial was the only appropriate remedy because the limiting instruction only served to further highlight an "improper alliance" between defense counsel and Dr. Julien.[19]

A trial court should grant a mistrial based on prosecutorial misconduct only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.[20] We will overturn the trial court's decision on a motion for mistrial only when there is a substantial likelihood the statements affected the jury's verdict.[21] Given the thorough curative instruction and the presumption that the jury

---

[18] Russell, 125 Wn.2d at 84.

[19] Appellant's Br. at 23.

[20] Russell, 125 Wn.2d at 85.

[21] Id.

followed it, we cannot conclude there was a substantial likelihood the testimony about the alleged relationship affected the jury's verdict. The court did not abuse its discretion in denying Brandich's motion for a mistrial.

*Statement of Additional Grounds*

In his statement of additional grounds, Brandich asserts the trial court failed to adequately poll the entire jury after two of the jurors were present in the courtroom as Brandich entered in restraints. The courtroom deputy immediately noticed the problem, and the jurors were sent back to the jury room. The court then questioned the two jurors who were present when Brandich entered to determine what they say and whether they communicated with other jurors about the issue. Juror 11 told the court he had seen Brandich in restraints, and the court excused that juror. Juror 8 told the court she had averted her eyes when she saw Brandich, and that she did not see the restraints. Over defense objection, juror 8 remained on the jury. The court admonished juror 8 to refrain from talking "about the questions we've had here; just don't repeat anything to the other jurors."[22]

"A substantive claim of unconstitutional shackling in this [s]tate is subject to harmless error analysis."[23] The defendant must show that the shackling "'had substantial or injurious effect or influence on the jury's verdict.'"[24] The trial court determined, after questioning juror 8, that juror 8 had not seen Brandich in restraints.

---

[22] RP (Feb. 2, 2012) at 13.

[23] In re Pers. Restraint of Davis, 152 Wn.2d 647, 694, 101 P.3d 1 (2004).

[24] Id. (quoting State v. Hutchinson, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998)).

We do not disturb this credibility determination on appeal.[25] Because the court excused the juror who saw Brandich in restraints, the shackling did not affect the jury's verdict.

Affirmed.

WE CONCUR:

---

[25] Id. at 682-83 (trial court's credibility determination of a juror who testified at a reference hearing regarding shackling of defendant could not be disturbed on appeal).